Appellant. Mr. Baird for the Appellant. Ms. Bonello for the Appellee. Mr. Baird, good morning. Good morning, Your Honor. Good morning to the Court. My name is Douglas Baird. I'm the law firm of Keller & Heckman. I'm joined this morning by Kishore Khan, an associate with the firm. I'm here on behalf of Mr. Sherman Mitchell, who is appealing his conviction for four  CCP-related crimes. We raised a number of issues in our brief, all of which we believe merit a reversal of that conviction. Which one is your strongest one? I believe the strongest one, Your Honor, is the one that the government failed to identify, prove the identity of the liquids that were seized during the course of this investigation. The chain of custody? Well, it's not exactly chain of custody. I think that's one of the interesting points, Your Honor. The chain of custody generally is a situation where one end of the process of seizure to analysis and the other end of that process have been joined. And what's missing is a link in the middle of how the drugs got from the seizure to the lab. We have that issue. But more importantly, we have the issue that the two ends were never linked. And I'd submit to the court that that establishes two problems with the conviction. One is the authenticity of what was analyzed and whether it was in fact the drugs that were taken, which goes to the admissibility of that evidence. But more importantly, I think, Your Honor, it goes to whether there was a sufficiency of the evidence to demonstrate that Mr. There's no testimony other than the seizure and the analysis that identifies what Mr. Mitchell was allegedly doing as being involved in PCP. There's no statements by him. There are no documents that says I'm offering to sell PCP. There's no buyers who said they bought PCP from him. The only evidence are the boxes that were recovered and the liquids that were in those boxes. And what makes this case unusual in another aspect is the processing of the suspected PCP was in fact a two step process. The liquid was taken to police officer Abdullah, where he created a sample of one ounce of the liquid in a generic one ounce vial, which was unmarked. And then that vial was analyzed by the chemist. And in both those stages, the government failed to prove the identity of what was happening. No one testified to bringing the drugs to to officer Abdullah. I checked this morning because it occurred to me as I was thinking about my argument. That maybe the agent TAR hadn't testified that he took the drugs, the first box, the November 2012 box to Abdullah. And in fact, he had what he testified to is that the drugs went to Abdullah. Now, I don't know who brought them. Abdullah didn't remember who brought the drugs to him. He didn't remember who he gave the drug samples to. Well, now he testified that either TAR or Mulcahy would ever deliver the packages to him. Right. But he wasn't sure which one. We don't know which one. He didn't know which one. I know. But one or the other did. To the best of his recollection, one or the other did. Neither of them testified to having done that. Mulcahy and TAR both testified at the trial. Neither of them testified to actually bringing the packages to Abdullah. And in fact, the PG County officer said he turned his two seizures, the February seizures, over to DEA. He didn't identify any officer. The way these cases are usually tried is the drugs come in first because the chemist has the drugs in his safe at the lab. And once the chemist has gone through his or her testimony, then the seizing officer identifies those samples and the transporting officer does as well. That didn't happen here. And it's curious that Abdullah didn't even identify the samples that were analyzed as having been created by him. Well, I thought we had the photos and I thought. All right. We have a photo, Your Honor, that was submitted by the government. I would submit to the court that that photo was created for the purposes of this appeal. The bag was what was in evidence. The photograph was never in evidence. It wasn't in the books that was given to the defense counsel in preparation. It wasn't marked as an as an exhibit. It wasn't shown to the jury. What we've got, the government is total reliances on the bags in which the samples arrived at the lab. And the first point I would make, Your Honor, is that as far as the record shows, that bag was never shown to the jury. There's no evidence that it was exhibited on the Elma or otherwise passed around the jury. And there's certainly no evidence that it ever went to the jury room. And it would have been highly unlikely that it did. Drugs just don't go to an unsupervised jury. So there's no basis upon which the jury could have relied on those envelopes to make the connection and find beyond a reasonable doubt that what was seized was in fact PCP and thus that Mr. Mitchell was involved with PCP. Furthermore, the government didn't rely on these envelopes when it opposed the challenge to the chain of custody at the trial. They relied on testimony or alleged purported testimony. I actually don't think much testimony was there about case numbers and other exhibit numbers that appeared or that were testified to by Officer Abdallah and by the lab. But as the court is aware from the brief, one of those exhibits, exhibit 1B, was never identified, was never testified to. Abdallah didn't say he created it, and yet it showed up in court. Furthermore, we submit that these writings are unreliable hearsay. They were never authenticated. We don't know who wrote any of it. We don't know when it was written. And finally, because it wasn't offered by the government for the purposes for which they're now citing it, it was never argued with the trial judge as to whether it was admissible or not. And finally, I'd note, Your Honor, that it doesn't say this was seized from Mr. Mitchell or it was seized from the package that I got at the Onyx or it came from the PG County. It's got some indications of who was involved, but nobody's identified it, nobody in a more general sense testified to the process. There's no testimony that I recall in the record that described in a general way how is evidence processed, how are labels created, that labels are put on, who signs them, what they mean, and how they're created and transported. So there's no even general evidentiary basis to support any conclusions based on these photographs. And as we've noted in our reply brief, we submit that there are some indications on the label that call them into question. First of all, there's the whole question of Exhibit 1B, and then there's the whole numerous entries about the net weight, which appear to show that it weighed more after it was analyzed than before it was analyzed. It's not a difficult question of proof. When I was an assistant user attorney a long time ago, it was simple. You called the chemist, the chemist brought the evidence, it was marked, and then it was shown to the seizing officer who identified it. That just didn't happen here. The government just failed to meet its burden. If there are no other questions about that particular issue, I'd just like to point out, we also believe that the prosecutor's arguments in this case, particularly her closing argument in rebuttal, are an additional strong basis for this case to be reversed. We believe the case was not a strong case. It was clearly a circumstantial case. The government probably believed that its case against Mr. Couser was as strong as its case against Mr. Mitchell, and it obviously didn't convince the jury in that case. And yet the prosecutor made some very strident, inaccurate statements during her rebuttal argument attacking defense counsel and, as we've noted and the government concedes it was certainly unfortunate, argued that these men should be held responsible for bringing this poison into the district, and that was the last statement she made and the last thing that the jury heard. If there are no further questions, I'll reserve my remaining time for rebuttal. All right. Good morning, Mr. Nello. Can I ask you about these photos? What is your understanding about the photos? Which photos are you referring to, Your Honor? Are you referring to the photos of the heat seals that are in the record? Yes. Yes, those are photos that were taken. Actually, I don't know whether they were taken for the purpose of appeal or not. I don't believe the photos were offered at trial. The actual heat seals were shown to the chemist, and the heat seals were what were presented at trial. And, by the way, if the court wishes to see the heat seals, we're more than happy to make them available for reviewing. I'd like to address this chain of custody issue and note that the evidence of establishing chain of custody is a little hard to keep straight, and appellants' focus on what was not presented may be obscuring the significance of the evidence that was presented. And if the court will indulge me, I'd like briefly to walk through the evidence that does establish the chain for the drugs in this case. Starting with the November 2012 drugs, these were the bottles that were intercepted at the onyx. DEA Exhibit 1, Government Exhibit, Trial Exhibit 104. Step 1, the seizure. We have Agent Tarr testify that he obtains the shipping boxes at the loading docks at the onyx. This is on November 26. He obtains a search warrant, opens the boxes the next day, discovers the bottles. Step 2, from Tarr to Abdallah. Tarr testifies that the bottles went to Joe Abdallah. No objection, and the opportunity to cross-examine. Defense did not choose to take him up on that. And that testimony was corroborated by Abdallah, who testifies that he received the bottles from either Tarr or Brian Mulcahy, who was a DEA agent who was working with Tarr. Step 3, from Abdallah to the heat seal. Abdallah testifies that after he draws out the sample, tosses out most of the contents of the bottles, replaces it with iced tea, he gives the items back to Mulcahy, and he testifies, page 42 of the October 10th transcript, that the items were processed by Mulcahy and placed in the heat seals, or placed in the evidence bags, by him. Now, the next step is from the heat seal to the chemist. To be sure, there's no testimony about how the heat seals travel to the lab. But if there's a hole here, it's a shallow one. Because, one, we have the testimony of Abdallah, who identifies the photo in Government Exhibit 100G, which is a photo of the one-out sample, as the sample that was submitted to the DEA Mid-Atlantic Lab chemist for an analysis. We also have the testimony of the chemist, who discusses the procedures at the lab for checking out items, for making sure the number's matching up, for making sure there's no sign of tampering. And he found no sign of tampering here. And then we have a comparison of the heat seal and the DEA lab analysis. I note, by the way, that the parties in the judge refer to that report of analysis as the DEA-7. That's a term that we're all used to. In fact, if you look carefully at Supplemental Appendix 137, it's actually now called the DEA-113. New fact for the day. Note, with respect to the heat seal itself, appellant argues that the notations on that are hearsay. At trial, the only hearsay objection appellant raised was to the notations by the first chemist. You'll recall that the original chemist, Tupic, was unable to testify due to a family emergency. Chemist Liu retested the drugs during the trial, and the judge overruled the hearsay objection with respect to what the first chemist had written, apparently relying on the residual exception to the hearsay rule when he finds circumstantial guarantees of trustworthiness. The defense never suggested there was any hearsay problem or asked for redaction on the stickers of the heat seals when they were admitted into evidence. Note, too, that, as Mr. Bair has pointed out, there are really two issues raised by the chain of custody. One is whether the district court abused its discretion in admitting the drugs, whether there was sufficient authentication. And there, of course, gaps in the chain tend to go to weight rather than to admissibility. And then the second issue is the sufficiency of the evidence, whether the government sustained its burden of proving that appellant possessed PCP. And to that end, the court can consider not only the evidence of the chain of custody, but also the other evidence indicating that appellant did possess PCP. For example, the court can consider that these drugs were all shipped from L.A., a source city. Consider that the bottles looked, smelled, or packaged like PCP. That in appellant's apartment were tools for a distribution enterprise specifically tailored to PCP. There was lighter fluid. There were vials. There was air freshener. All that together supports the conclusion that, indeed, this was PCP. Now, appellant notes, and by the way, let me note, too, just going back to these two issues, that with respect to the July drugs, you recall that the July drugs were not actually the subject of any substantive count. So the issue for the July drugs is not whether there was sufficient evidence to convict appellant of the July drugs, but rather whether the judge erred in admitting them. The July drugs were mentioned as an overt act in the conspiracy only, and there's plenty of other evidence supporting them. There are plenty of other overt acts alleged and plenty of other evidence supporting the conspiracy. Appellant argues in relation to the concerns about the Exhibit 104 and concerns about what was going on here. He notes that there's no evidence. The objection to the July drugs was 404B. 404B. Your response to that? Oh, I'm sorry. I thought you were talking about there's an exhibit number 404. I'm talking about the federal rules of evidence. Yes. The judge, well, actually, it was not really teed up specifically for the July drugs. Appellant on appeal has argued that the various shipments that were not charged were improperly proofed up at trial. The judge ruled, actually, even though an objection had not been raised, but the July drugs certainly fell within the time period of the conspiracy, as did all the shipments where the drugs were not actually introduced, but the government introduced evidence that appellant was traveling to Los Angeles and shipping back packages during that time period. Did you get notice of the intent to use the July drugs? Pre-trial notice? Notice, well, one, notice wasn't required because these were drugs that were intrinsic to the conspiracy. This was not other crimes evidence subject to the strictures of Rule 404B and the procedural requirements of Rule 404B. So I don't know when the defense became aware of the July drugs. I don't know the procedural history of that. The extrinsic, extrinsic line that you're proposing is one that I have often found quite baffling. Well, the point is that the July drugs – they were introduced not for the purpose of showing that this guy had a bad character, but for other reasons such as motive, opportunity. Well, not only that, Your Honor, they were offered as direct evidence of the conspiracy because, again, it was alleged in the conspiracy charge that appellant was shipping drugs throughout the time period of February 2011 to February 2013. And these drugs fell right in that. And they were offered and argued as evidence of the conspiracy. But they're modus operandi, aren't they? I would think they are. They are, yes. If you want to view them even in the prism of 404B, they would be offered for a purpose other than propensity. But our position is we don't even have to reach one of the 404B exceptions because they were offered as direct evidence of the charged offense of conspiracy. Let me just briefly address some of the concerns raised by appellant. He expresses concern with this Government Exhibit 1B. This was the sample that, as the prosecutor explained at a bench conference, Detective Abdallah, after replacing the watered-down drugs in the bottles, he drew off an additional sample and tested that so that Couser, when he picked up the drugs, would be still actually possessing PCP. Couser was acquitted. That issue is moot. 1B is not a basis of appellant's convictions. He was charged based on Exhibit 1, Exhibit 104, and Exhibit 6 and 9. 1B is really a red herring. Does the Court have any further questions on the chain of custody? And then just very briefly on the closing argument, our brief, I believe, addresses the specific points appellant has raised. I would just note that at sentencing, the judge himself noted, page 11 of the June 25th sentencing transcript, that even he considered the evidence to be overwhelming. And based on the evidence that was presented and the really relatively minor concerns presented by these comments in closing argument, there would be no basis to reverse the conviction. All right. I have one question just because I'm curious. Does the record reveal why another judge came in to answer the questions of the jury? That's very unusual. That's interesting that that's your reaction, Your Honor, because that happens all the time in superior court. And when I saw that, I didn't blink an eye. If a judge is at a doctor's appointment or unable to be there at the time the jury comes back, it's a very common practice across the street. It's a bad practice because if the jury is sitting there, the judge should be there. Agreed. And there may be questions that a judge who comes in may not be in a position to ask. Sometimes judges can confer telephonically with the trial judge. But here the question that was asked was properly answered by Judge Boasberg, and there's no suggestion that Judge Boasberg erred in answering the question. I wasn't asked about that. Okay. Any more questions? Then we'd ask that the court affirm the judgment of the district court. Thank you. Thank you. How much time do we have? Okay. Just to answer your question, Judge Henderson, my recollection is that the judge had a preexisting commitment out of town, and I believe the record also shows that Judge Boasberg spoke with Judge Leon prior to answering the jury's question. There was no testimony about the envelopes, about which we've been discussing this morning, and therefore the judge never ruled on whether these notations on the envelopes were proper hearsay or were not hearsay. The only objection was when there was a question asked of the chemist about a statement written by another chemist, and my recollection of the record is that the judge said it's already been admitted. That was his response to the hearsay objection. He never addressed whether there was any reliability or any basis not to apply the hearsay exception to even that limited piece of writing on the heat shields. But as to the other writings, they were never offered. There was no discussion of them. The defense never objected to them because they were never offered for the purposes for which they're being cited to this court. The other point I want to raise on the July 2011 drugs that Judge Randolph asked about, we don't believe that there was adequate evidence that they were part of the conspiracy, certainly not a conspiracy between Mr. Mitchell and Mr. Kauser. There's no testimony of Mr. Kauser being involved with those drugs. There's no question of anybody else being involved with those drugs. It's quite conceivable that Mr. Mitchell, if he did in fact send the drugs, was sending them to himself because there's testimony that he would go to California and ship packages to the Onyx, which he picked up himself. So we submit that it was only offered for purposes that are not acceptable to show, either bad character or some other purpose. It doesn't show motive, and it doesn't show intent, we don't believe, and certainly we don't think it's part of the substantive evidence of conspiracy, given the time difference and the different players that are involved. If there are no further questions, we'll ask the court to reverse the conviction and submit on the brief. Mr. Baer, you were appointed to represent your client. You've done a wonderful job.  You're welcome, Your Honor.
judges: Henderson, Griffith, Randolph